UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/27/06

-------------------------------------------------------X

In the matter of:                                    :
                                                     :
    Target Two Associates, L.P.,                     :
                                                     :
                                                     :     **OPINION AND ORDER**
          Debtor.              :
                                                     :     **04 Civ. 8657 (SAS)**
                                                     :
-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

        This bankruptcy appeal arose from the failure of the appellant, 129

Front Street Associates, LLC ("Front Street") to close on the purchase of real

property located at 129 Front Street, New York, New York, (the "Property"),

which was the sole asset of the debtor-appellee, Target Two Associates, L.P.

("Target Two").  Front Street appeals a July 27, 2004 order by Judge Cornelius

Blackshear that confirmed the forfeiture of Front Street's earnest money deposit of

one million dollars.[1]  This Court has jurisdiction over Front Street's appeal

pursuant to section 158(a)(1) of Title 28 of the United States Code.  The appeal

returns to this court after remand to the bankruptcy court for supplementation of

---

    [1]    *See In re Target Two Assocs., L.P.,* No. 04-11180(CB) (July 27, 2004) ("Forfeiture Order") at 1.

the record with a statement describing the considerations underlying its rejection

of the appellant's plea for equitable relief from this order.[2]  Judge James M. Peck

assumed the case on remand, Judge Blackshear having left the bench during the

pendency of this appeal.  The bankruptcy court held an evidentiary hearing on

June 30, 2006.[3]  The record before this Court is now sufficient to permit

meaningful appellate review.

## II.    BACKGROUND

### A.    Front Street

Front Street was formed by Jeffrey Levitt and Daniel Biggman for the

sole purpose of acquiring the Property.[4]  Levitt and Biggman learned that the

Property was to be sold in January, 2004.[5]  They investigated the Property, and

formed Front Street shortly thereafter.[6]  Not long after forming Front Street, Levitt

---

[2]      *See In re Target Two Assocs.*, No. 04 Civ. 8657, 2005 WL 1140538
(S.D.N.Y. May 16, 2005).

[3]      *See* App. Mem. at 4; 9/18/06 Brief for Respondent Target Two
Assocs. ("Resp. Mem.") at 4.  The copy of the hearing transcript provided to the
court incorrectly bears the date July 30, 2006.

[4]      *See* Transcript of June 30, 2006 Evidentiary Hearing ("Tr.") at 67.

[5]      *See id.* at 63.

[6]      *See id.* at 63-66.

and Biggman brought Michael Mazzeo into the company as a one-third partner.[7]

Biggman invested $250,000.00 in the partnership, and Mazzeo contributed

$750,000.00. Levitt contributed no money at the formation of the company, but

invested more than $200,000.00 during the lifetime of the project.[8]  Biggman,

Mazzeo, and Levitt intended to retain seventy percent of the equity of the

company, and invite other investors to share the remaining thirty percent.[9]  None

of the partners were real estate professionals, but Levitt, as an architect, and

Mazzeo and Biggman, as electrical contractors, each had some knowledge of the

real estate business.[10]  Both Levitt and Mazzeo owned their own companies.[11]

### B.     Target Two's Bankruptcy Proceedings and the Sale of the Property

Target Two filed a voluntary petition for bankruptcy on February 24,

2004, under Chapter 11 of the Bankruptcy Code.[12]  In an order dated March 29,

---

[7]     *See id.* at 67-68.

[8]     *See id.* at 79-80.

[9]     *See id.* at 88.

[10]     *See id.* at 13, 63.

[11]     *See id.*

[12]     *See,* 2/24/04 Form B1 Voluntary Petition of Target Two, No. 04-11180(CB), Docket No. 1.

2004 ("Sale Order"), Judge Blackshear authorized the sale of the Property by auction, and set forth the terms and  conditions of the sale, including a provision requiring bid deposits of one million dollars from all bidders wishing to participate in the auction.[13]

The order provided that the deposit of the highest bidder would be "non-refundable," and that if the highest bidder failed to close the purchase by the closing date of June 1, 2004, the deposit and any interest thereon would be "forfeited and . . . become property of the Debtor's Estate."[14]  The Sale Order also provided that the highest bidder could apply for a one-time extension of the closing date to June 30, 2004, upon payment of an extension fee of 0.75% of the amount of the successful bid.[15]  The extension fee, deposit, and any interest thereon would all be forfeit upon failure to close the purchase by June 30, 2004.[16] On closing, the deposit would be returned, with interest.[17]  The extension fee, if any, would be retained by the estate, subject to a per diem credit for each day of

---

[13]     *See In re Target Two Assocs., L.P.,* No. 04-11180(CB) (Mar. 29, 2004) ("Sale Order").

[14]     *Id.* ¶¶ 1, 9.

[15]     *See id.* ¶ 7.

[16]     *See id.* ¶ 9.

[17]     *See id.* ¶ 8.

the extension period not actually used.[18]

   The order also provided that the second-highest bidder would remain bound to its own bid as a backup bidder in the event that the highest bidder defaulted.  The backup bidder's deposit would be retained in escrow until the highest bidder closed on its purchase of the Property.[19]  If the highest bidder defaulted, the backup bidder would in turn forfeit its deposit if it failed in turn to close on its own bid.[20]  Once the highest bidder and backup bidder were determined at auction, all other bidders would be released from their commitments to their bids, and their deposits would be returned.[21]

   The auction took place in court on April 22, 2004.[22]  Front Street and eight other bidders qualified to bid at the auction by payment into court of the required one million dollar deposit.[23]  Front Street was represented at the auction

---

[18]  *See id.* ¶ 7.

[19]  *See id.* ¶ 8.

[20]  *See id.* ¶ 12.

[21]  *See id.* ¶ 5.

[22]  *See In re Target Two Assocs., L.P.,* No. 04-11180(CB) (June 29, 2004) ("Order Affirming Sale") at 1.

[23]  *See id.*

by Levitt, Biggman, and an attorney.[24]  Front Street was the highest bidder, having

bid $11.8 million.[25]  The backup bidder was Hang Sang Realty Corp. ("Hang

Seng"), with a bid of $11.75 million.[26]  The next highest bid was $11.0 million.[27]

Once Front Street won the bidding, Mazzeo was primarily responsible

for securing financing.[28]  Levitt was responsible for developing architectural plans

for the building, and was involved in seeking individual investors for the project.[29]

Mazzeo testified that he initially intended to secure financing from Intervest, a

bank with whom he had prior dealings, and that he was given a conditional oral

commitment for nine million dollars in financing.[30]  With this amount of financing,

Front Street would be able to close the purchase.[31]

In late May, not long before the first closing deadline, Levitt was

---

[24]     See Tr. at 69.

[25]     See Order Affirming Sale at 1.

[26]     See id. at 1-2.

[27]     See  8/30/06 Brief of Appellant 129 Front Street Assocs. ("App. Mem."), at 10.

[28]     See Tr.  at 103.

[29]     See id.

[30]     See id. at 18-19.

[31]     See id. at 42-44.

approached by Divino, a business that expressed an interest in purchasing the right

to close on the Property.  Divino tentatively offered nineteen million dollars.[32]

Levitt discussed the offer with Mazzeo, who agreed to sell the right to purchase

the building to Divino if the offer was serious.[33]  Levitt met with representatives of

Divino several times, and negotiated a price of twenty-three million dollars.[34]

Both Levitt and Mazzeo were uncertain about the "legitimacy" of Divino and its

offer.[35]  Levitt therefore presented Divino with a contract stating terms of sale that

included a provision for payment of a non-refundable deposit by Divino.[36]  Levitt

testified that the purpose of the non-refundable deposit provision was "to find out

if they [Divino] were real."[37]  Divino did not sign the contract or pay the deposit,

and stopped communicating with Levitt.[38]

On May 21, 2004, Front Street filed for the one-time extension of the

---

[32]    *See id.* at 77.

[33]    *See id.* at 46.

[34]    *See id.* at 76-77, 100.

[35]    *Id.* at 46, 77.

[36]    *See id.* at 77.

[37]    *Id.*

[38]    *See id.*

closing deadline from June 1, to June 30, 2004.[39]  Front Street tendered the

extension fee, which was $88,500.00, and Judge Blackshear granted the

extension.[40]  By the time of the first closing deadline of June 1, 2004, Mazzeo had

not secured a firm commitment from Intervest.[41]  Mazzeo testified at the hearing

that throughout most of June, despite having no written commitment from

Intervest, he remained confident that the deal would close successfully. [42]  Mazzeo

did not pursue any other sources of funding.[43]  On June 21, 2004, Mazzeo learned

that Intervest would provide a loan of only six million dollars, instead of the nine

million dollars Mazzeo expected.[44]

Once he learned that Intervest would provide only six million dollars

in financing, Mazzeo turned to Steven Content of Violin Associates to bridge the

---

[39]     *See* 5/21/04 Front Street Notice of Presentment to Extend Closing of
Sale of Real Property and Improvements, No. 04-11180(CB), Docket No. 40.

[40]     *See In re Target Two Assocs., L.P.,* No. 04-11180(CB) (May 21,
2004) ("Extension Order").

[41]     *See* Tr.  at 44.

[42]     *See id.* at 45.

[43]     *See id.* at 32.

[44]     *See id.* at 44-45.

three million dollar shortfall.[45]  Once again, Mazzeo obtained an oral commitment

from Content that the financing would be provided.[46]  However, less than two days

before the final closing date, Content withdrew his commitment.[47]  Mazzeo was

unable to find another source for the money before the final deadline passed.[48]

      On June 29, 2004, Judge Blackshear issued an order affirming the

sale to Front Street, authorizing transfer of clear title to Front Street, upon Front

Street's payment of the remainder of the purchase price.[49]  On June 30, 2004,

Front Street remained unable to close the purchase due to its inability to secure

financing, and informed the Escrow Agent of that fact.[50]  In an amended order

issued on July 14, 2004, however, Judge Blackshear reaffirmed his previous order

authorizing transfer of title to Front Street upon payment, modifying the order to

---

[45]    *See id.* at 22.

[46]    *See id.*

[47]    *See id.* at 56.

[48]    *See id.*

[49]    *See* Order Affirming Sale at 1-2.

[50]    *See* 7/14/04 Application by Kenneth Yudell (member of Aronson, Goldfarb, Re and Yudell, L.L.C., escrow agent) for Entry of Order Authorizing and Directing the Transfer of Escrow Funds to a New Escrow Account ("Forfeiture Motion"), No. 04-11180(CB), Docket No. 49.

permit transfer of title to the backup bidder, Hang Seng, in the alternative.[51]

On July 15, 2004, the Escrow Agent filed an application seeking final

transfer of Front Street's deposit and extension fee to the Debtor's Estate. Front

Street filed its objection on July 21, 2004.[52] The objection, accompanied by a

Memorandum of Law and an affidavit by Levitt, argued, *inter alia,* that forfeiture

of the deposit would be inequitable and contrary to New York State law.[53] On

July 27, 2004, Judge Blackshear ordered the forfeiture of Front Street's deposit

and extension fee, and the transfer of these funds to a new escrow account to be

held as part of the Debtor's Estate.[54] The order contained no findings of fact or

conclusions of law, noting simply that while the court had "received and

---

[51]     *See In re Target Two Assocs., L.P.,* No. 04-11180(CB) (July 14, 2004) ("Amended Order Affirming Sale").

[52]     *See* 7/21/04 129 Front Street Associates' Objection to Escrow Agent's Application for Entry of Proposed Order and Notice of Presentment and Directing the Transfer of Escrow Funds to a New Escrow Account ("Objection to Forfeiture"), No. 04-11180, Docket No. 50.

[53]     *See id.* ¶¶ 7-8. *See also generally* 7/21/04 Affidavit of Jeffrey Levitt in Opposition, attachment to Objection to Forfeiture; 7/21/04 Memorandum of Law of Front Street in Support of Its Objection to Escrow Agent's Application for Entry of Proposed Order and Notice of Presentment and Directing the Transfer of Escrow Funds to a New Escrow Account, attachment to Objection to Forfeiture.

[54]     *See* Forfeiture Order at 1.

considered the opposition" of Front Street, the objections therein were overruled.[55]
On July 30, 2004, Hang Seng closed its purchase of the Property.[56]  On August 6,
2004, Front Street filed a Notice of Appeal of the Forfeiture Order.[57]

### C.    Front Street's Appeal

On appeal to this Court, Front Street presented claims sounding in
both law and equity.[58]  Front Street's legal arguments were insufficient to warrant
reversal of the Forfeiture Order, but Front Street's equitable arguments could not
be dismissed without further development of the record in the bankruptcy court.[59]
The appeal was therefore remanded for supplementation of the record, so that the
Forfeiture Order could be subjected to meaningful appellate review.[60]

### D.    Proceedings Post-Remand

On remand, Judge Peck granted a motion by Target Two, opposed by

---

[55]     *Id.*

[56]     *See* 8/4/04 Report of Escrow Agent, No. 04-11180(CB), Docket No.
52, ¶ 1.

[57]     *See* 8/6/04 Notice of Appeal ("Notice of Appeal"), No. 04-
11180(CB), Docket No. 58.

[58]     *See In re Target Two Assocs.,* 2005 WL 1140538, at *2-3.

[59]     *See id.* at *4.

[60]     *See id.*

Front Street, to permit further supplementation of the record with a fact-finding hearing.[61] The hearing took place on June 30, 2006.[62] Mazzeo and Levitt, two of the three principals of Front Street, testified on its behalf.[63] William O'Connor, an attorney representing Hung & Chung Real Estate Development Corporation, one of the major creditors of Target Two, was called by counsel for Target Two, and was the only other witness.[64] The testimony of Mazzeo and Levitt, summarized earlier, focused primarily on their efforts to secure financing for the purchase, and how their actions were motivated by their perception of the potential for profit and loss in the transaction.[65]

Mazzeo and Levitt testified that apart from Divino, they never tried to find an investor to acquire their right to purchase the Property, whether at cost or

---

[61]     *See* Transcript of April 26, 2006 Proceedings ("Preliminary Hearing Tr."), No. 04-11180(CB), Docket No. 125  at 4-6. *See also* 3/23/06 Statement of Lance Spodek, counsel for Target Two, Supporting Need for Hearing, No. 04-11180(CB), Docket No. 122; *and* 3/27/06 Letter of Sanford Solny, counsel for Appelants, to Bankruptcy Judge James Peck.

[62]     *See* App. Mem. at 4; Resp. Mem. at 4.

[63]     *See* Tr. at 12, 63.

[64]     *See id*. at 106, 111.

[65]     *See supra* notes 26-46 and accompanying text.

for a profit.[66]  Both Mazzeo and Levitt testified that they were aware of the risk of

bidding in the auction.[67]  Mazzeo, in particular, was emphatic that he weighed the

risks continually during the period between submitting the winning bid and failing

to close the purchase on June 30, 2004.  For example, Mazzeo was asked about his

state of mind after June 21, 2004, when he learned that there was a three million

dollar shortfall in the financing of the purchase.  Target Two's counsel asked:

"And at that point, is [your estimate of the potential profit] the reason why you did

not contact brokers and bank people and try to dump this contract.  You were still

prepared to ride the risk to obtain a profit, is that correct?"[68]  Mazzeo answered:

"Correct."[69]

### E.    The Bankruptcy Court's Findings and Statement

Judge Peck delivered his findings in an oral ruling from the bench.

He found both Mazzeo and Levitt to be credible witnesses.[70]  He found that

---

[66]    *See* Tr. at 47, 95, 104, 106.

[67]    *See id* at 50, 52, 85-86.

[68]    *Id.* at 56.

[69]    *Id.*

[70]    *See* Transcript of 6/30/06 Bench Ruling of Judge Peck ("Bench Ruling") at 6, 9.

-13-

Mazzeo and Levitt acted in good faith in attempting to close the purchase.[71]

However, Judge Peck also ruled that although Front Street expended significant

effort to secure financing, it acted less vigorously than the judge believed was

required under the circumstances.[72]  He further found that the purchasers were

"sophisticated business people . . . advised by sophisticated counsel."[73]  He found

that the principals of Front Street knowingly assumed the risk of losing the deposit

in order to pursue what they believed would be a profitable real estate

transaction.[74]  Finally, Judge Peck found that if the deposit money were retained

by the estate, it would pass to unsecured creditors, and not equity holders of

Target Two.  If the estate retained the deposit, these creditors would receive

approximately forty-six cents on each dollar owed.  If the deposit were returned to

Front Street, these creditors would receive approximately fourteen cents on the

dollar.[75]

In making his determination of the equities of the case, Judge Peck

---

[71]     *See id.*

[72]     *Id.* at 12.

[73]     *Id.* at 13.

[74]     *See id.* at 6, 8.

[75]     *See id.* at 9-10.

-14-

considered the loss to Front Street and its principals, and their good faith efforts to close as tending to support their equitable claim.[76]  Weighing against their claim, the judge considered the loss to the unsecured creditors, Front Street's willing and knowing assumption of the risk of loss, Front Street's failure to pursue further avenues to close the purchase, and the need for finality in orders of the bankruptcy court governing the sale of debtors' assets.[77]  Judge Peck concluded that "the bid procedures should be strictly construed and that relief should be afforded only in clear cases" of inequitable results, and that enforcement of Judge Blackshear's Forfeiture Order was not inequitable to Front Street.[78]

## III.   LEGAL STANDARDS

### A.   Standard of Review

A bankruptcy court's exercise of its equitable authority is reviewed for abuse of discretion.[79]  Abuse of discretion is "(i) a decision 'rest[ing] on an error of law (such as application of the wrong legal principle) or a clearly

---

[76]   *See id.* at 12.

[77]   *See id.* at 10-14.

[78]   *Id.* at 13.

[79]   *See Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*, 352 F.3d 671, 673 (2d Cir. 2003). *See also Yadidi v. Herzlich (In re Yadidi)*, 274 B.R. 843, 847 (B.A.P. 9th Cir. 2002) ("The application of § 105 power is reviewed for abuse of discretion").

erroneous factual finding,' or (ii) a decision that, 'though not necessarily the product of a legal error or a clearly erroneous factual finding[,] cannot be located within the range of permissible decisions.'"[80]  "Moreover, 'to further the purposes of Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his [or her] orders to meet differing circumstances.'"[81]

The bankruptcy court's factual determinations are reviewed for clear error and its legal conclusions de novo.[82]  Clear error review permits reversal only if the reviewing court is "'left with the definite and firm conviction that a mistake has been committed.'"[83]  Thus, if the factual findings of the bankruptcy court are "plausible in light of the record viewed in its entirety," this Court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the

---

[80]     *Schwartz,* 352 F.3d at 678 (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)).

[81]     *In re Integrated Resources*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983)).

[82]     *See MBNA Am. Bank, N.A. v. Hill,* 436 F.3d 104, 107 (2d Cir. 2006).

[83]     *See Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.),* 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

evidence, the factfinder's choice between them cannot be clearly erroneous."[84]

## B.   The Scope of the Bankruptcy Court's Equitable Powers

"[I]t is axiomatic that bankruptcy courts are 'courts of equity,

empowered to invoke equitable principles to achieve fairness and justice in the

reorganization process.'"[85]   Nevertheless, the equitable powers of the bankruptcy

courts derive from the statutory grant of such authority by Congress, and are

limited thereby.[86]   The Second Circuit has held:

> Section 105(a) of the Bankruptcy Code gives the court equitable power to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. This Court has long recognized that Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code. It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.[87]

Thus, the equitable powers of the bankruptcy court cannot be used to

---

[84]      *Anderson v. Bessemer City,* 470 U.S. 564, 574 (1985).  *Accord Neshewat v. Salem (In re Salem)*, 94 Fed. Appx. 24, 25 (2d Cir. 2004) (citing *Anderson*).

[85]      *Schwartz,* 352 F.3d at 680 (Straub, J. concurring) (quoting *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994)).

[86]      *See New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.),* 351 F.3d 86, 92 (2d Cir. 2003).

[87]      *Id.* (citing 11 U.S.C. § 105(a)).

contravene the provisions of the Bankruptcy Code.[88]  The Supreme Court has also

ruled that a bankruptcy court may not invoke equity to modify rights or interests

created by state law, except to "the extent of actual conflict with the system

provided by the Bankruptcy [Code]."[89]

### C.    The Bankruptcy Court's Powers to Control Bankruptcy Sales

Section 363(b)(1) of title 11 of the United States Code provides that:

"The trustee, after notice and hearing, may . . . sell . . . other than in the ordinary

course of business, property of the estate."[90]  A debtor in possession has the same

powers and duties with respect to the sale of property of the Debtor's Estate as a

trustee.[91]  Thus, "[u]nder the Code, the conduct of an actual sale itself, pursuant to

section 363, has been left to the discretion of the trustee or the debtor in

possession."[92]  Nevertheless, the court "retains authority and discretion in setting

---

[88]    *See Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC),* 423 F.3d 166, 184 (2d Cir. 2005).

[89]    *Butner v United States, et al.,* 440 U.S. 48, 54 (1979).  *Accord In re Gifford*, 256 B.R. 661, 664 (Bankr. D. Conn. 2000) (applying *Butner,* which was decided under the Bankruptcy Act, to the new Bankruptcy Code); *In re Morton,* 866 F.2d 561, 563-64 (2d Cir. 1989) (same).

[90]    11 U.S.C. § 363(b)(1).

[91]    *See id.* § 1107.

[92]    *In re Wilson Freight Co.,* 30 B.R. 971, 974 (Bankr. S.D.N.Y. 1983).

-18-

and monitoring guidelines for the sale."[93]  "Section 105(a) provides the authority

for the bankruptcy court to carry out the provisions of section 363(b)."[94]

### D.    Federal Interest of Finality in Bankruptcy Sales

Courts repeatedly emphasize the importance of enforcing the finality

of bankruptcy sales.[95]  With respect to buyers at such sales who fail to complete

their purchase of real property, courts pursue this policy of finality by strict

enforcement of the terms of sale against the buyer.[96]  Where the terms of sale

expressly provide that the defaulting bidder forfeits his earnest money deposit,

such a term is enforced.[97]  Such terms are binding even if the buyer is unaware of

---

[93]    *Id.*

[94]    *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 27 (S.D.N.Y. 2005).

[95]    *See, e.g., In re Oyster Bay Cove, Inc.,* 161 B.R. 338, 342 (Bankr. E.D.N.Y. 1995); *In re Chateaugay Corp.*, 186 B.R. 561, 593 (Bankr. S.D.N.Y. 1995); *In re Silver Bros.*, 179 B.R. 986 (Bankr. D.N.H. 1995) ("Concerns of institutional integrity translate into a strong policy of finality in the judicial sale process.").

[96]    *See,* e.g., *In re Oyster Bay Cove, Inc.,* 161 B.R. at 345;  *In re Winston Inn & Rest. Corp.,* 120 B.R. 631, 636 (E.D.N.Y. 1990).

[97]    *See, e.g., In re Oyster Bay Cove, Inc.,* 161 B.R. at 345; *In re Governor's Island*, Nos. 90 Civ. 2489, 90 Civ. 2497, 1991 WL 161514 (4th Cir. Aug. 23, 1991).

them.[98]  While courts have recognized that equitable considerations might lead to a

different result in extraordinary cases, a survey of the cases has not disclosed a

single instance where a defaulting bidder successfully opposed forfeiture of his

earnest money deposit, where the terms of sale specified that the deposit was

unrecoverable.[99]  Equitable considerations that courts have acknowledged might

compel modification of an order confirming a sale in order to permit a defaulting

buyer to recover its deposit are limited to "fundamental errors or compelling

equities arising out of fraud, mistake or like infirmity."[100]

## IV.    DISCUSSION

The record developed below on remand provides ample support for

Judge Peck's factual findings that the failure of Front Street to close on this

transaction was the result of the failure of Front Street's principals to see the need

to obtain prompt and *firm* commitments from financiers, combined with their

unwillingness to reduce their hoped-for profit by taking on investors or selling

---

[98]      *See Balaber-Strauss v. Markowitz* (*In re Frankel*), 191 B.R. 564, 569
(Bankr. S.D.N.Y. 1995).

[99]      *See In re Frankel*, 191 B.R. at 572.  *Cf. First Penn. Bank, N.A. v.
Gloria La Viscount,* 15 V.I. 318 (Terr. Ct. V.I. 1978) (ordering remittance of
earnest money deposit where terms of sale did not state that it would be forfeited).

[100]     *In re Frankel,* 191 B.R. at 573.

their option on the property.  Front Street principal Michael Mazzeo was disarmingly honest: just days before the expiration of the extension period (and the permanent forfeiture of Front Street's one million dollar deposit), Mazzeo was content to "ride the risk," rather than act to protect his investment.[101]

Front Street argues that the forfeiture of this deposit is unfair, and represents a windfall to the Debtor's Estate.[102]  The record does not support this conclusion.  From April 22, 2004 to June 30, 2004, Front Street owned an exclusive option to purchase the Property for $11.8 million dollars.  The option was not without value.  Divino's offer to purchase it alerted Front Street, if it were not already aware of the fact, that its option might be marketable at a profit.  The fact that eight other bidders were willing to place one million dollars at risk to secure a like option indicates that the $1,088,500 Front Street ultimately paid was not disproportionate to the option's value.[103]

Indeed, a buyer who could have helped Front Street reduce its losses, if not profit, was nearby the entire time.  The second-highest bidder, Hang Seng,

---

[101]     Tr. at 56.

[102]     *See* App. Mem at 23-26.

[103]     *Cf. In re Silver Bros.*, 179 B.R. at 1009 ("An auction sale with competing bidders is generally considered to establish sufficient value of the asset being sold.").

was contractually bound to purchase the property for only $50,000.00 less than

Front Street's bid if Front Street defaulted.  Hang Seng might have agreed to

assume Front Street's option in return for a payment of some amount less than the

one million dollars that Front Street would lose on forfeiture.  When, after the final

deadline had passed, Levitt spoke to a representative of Hang Seng, the

representative told him that he regretted that they had not "made some sort of

approach at doing something together."[104]  However, Front Street chose not to

look for any buyers.  They rode the risk.  It is not unfair to Front Street that it paid

for the value of the option it received, notwithstanding that it failed to realize this

value.  Nor is it unfair that Front Street, rather than the Debtor's Estate, should

bear the consequences of Front Street's failure to seek ways to cut its losses.

Because Front Street received value in this transaction, it is also

inaccurate to characterize the transfer of the deposit money to the Debtor's Estate

as a windfall.  As Front Street concedes, there *were* actual damages to the estate,

which Front Street estimated in its original brief to this Court at $234,140.80.[105]

Assuming, *arguendo*, that this figure does not underestimate the estate's actual

---

[104]     Tr. at 83.

[105]     *See* 1/18/05 Brief of Appellant 129 Front Street Assoc., L.L.C. ("1/18/05 Brief") at 11.

-22-

damages, it reduces the amount of the consideration the estate received in exchange for the grant of a valuable option.

The New York Court of Appeals held that "as applied to real estate down-payments approximating 10%," a purchaser who defaults may not recover the down-payment.[106] The forfeited deposit here is less than ten percent of the purchase price, and therefore is covered by this ruling. Nor does this case law "conflict with the system provided by the Bankruptcy [Code]."[107] Rather, it supports the critical federal interest in finality in such bankruptcy sales. Therefore, the bankruptcy judge did not abuse his discretion in denying appellants' petition to vacate the forfeiture order.

## V.   CONCLUSION

For the foregoing reasons, Front Street's appeal from the July 27, 2004 order of the bankruptcy court is denied. The Clerk of the Court is directed to close this motion [docket no. 1] and this case.

---

[106]   *Maxton Builders v. Lo Galbo,* 68 N.Y.2d 373, 381 (1986). Despite Front Street's suggestion to the contrary, there is no exception to this rule for purchasers who act diligently and in good faith. *See* 1/18/05 Brief at 21-23.

[107]   *Butner,* 440 U.S. at 54.

-23-

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 26, 2006

## -Appearances-

### For Appellant:

Sanford Solny, Esq.
Law Office of Sanford Solny
150 Broadway, Suite 1600
New York, N.Y. 10038
(212) 359-3090

### For Respondent:

Lance Roger Spodek, Esq.
Fitzgerald and Associates
330 West 58th Street, Suite 306
New York, N.Y. 10019
(212) 586-8606